USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/26/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    -against-

PHILLIP HESTER,

                          Defendant.

No. S1 19-cr-324 (NSR)

OPINION & ORDER

---

NELSON S. ROMÁN, United States District Judge:

Defendant Phillip Hester ("Defendant" or "Hester") is charged in a two-count superseding indictment, filed on July 23, 2019, with (1) being a felon in possession of a loaded firearm, in violation 18 U.S.C. § 922(g)(1), and (2) obstructing justice, in violation of 18 U.S.C. § 1512(c). (S1 Indictment ("SI"), ECF No. 10.) Presently before the Court are Defendant's (a) first and second motions to suppress certain statements made to law enforcement, evidence obtained from the Government's search of his cellphone and iCloud account, and two recorded jail calls; (b) first and second motions for a *Franks* hearing to assess whether government agents made materially false statements or omissions in connection with applications for search warrants targeting Defendant's cellphone and iCloud account; and (c) motion to sever the two counts of the superseding indictment. (ECF Nos. 16, 23.)

For the following reasons, Defendant's various motions are DENIED in their entirety.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from the criminal complaint filed in this matter, the indictment, and the parties' submissions.

### A.  The April 2, 2019 Incident

#### i.    The 911 Calls

On April 2, 2019, at approximately 11:00 a.m., two individuals called 911 to report a shooting in the vicinity of the Crossroads Apartment Complex at Brown Street in Peekskill, New York ("Crossroads").  (Defs. Mem. of Law in Supp. of First Mot. to Suppress ("First Mot."), ECF No. 18, at 5; Gov't Mem. of Law in Opp. to Defs. First Mot. ("First Opp."), ECF No. 20, at 1.)  In the first call, the individual ("Caller-1") reported "two Spanish kids and a black girl" were "shooting at each other."  (ECF No. 20-1 ("Ex. 1") at 0:11-0:16; ECF No. 20-2 ("Ex. 2") at 1.)  Caller-1 explained one individual was "pacing in . . . the parking lot" wearing all black.  (Ex. 1 at 0:36-0:43; Ex. 2 at 1.)  Caller-1 then explained the "young guy they were shooting at . . . ha[d] on . . . a red jacket" and was "recording [the incident] . . . with a cellphone."  (Ex. 1 at 3:14-3:22; Ex. 2 at 5.)

The second caller ("Caller-2") provided a similar account of "shots fire[d] up by 1103 Brown [Street]."  (ECF No. 20-3 ("Ex. 3") at 0:13-0:16; ECF No. 20-4 ("Ex. 4") at Tr. 1:18.)  Caller-2 explained that one individual was dressed in "a black[] []hoodie" and "running into 1101 [Brown Street]," while the other individual had run "through the parking lot with red on" and "towards the new firehouse."  (Ex. 3 at 0:21-0:48, 1:00-1:08; Ex. 4 at Tr. 1:20-2:18.)  As the call continued, Caller-2 indicated that police had passed the "guy with red on."  (Ex. 3 at 2:09-2:12; Ex. 4 at Tr. 4:2-7.)  Caller-2 then noted that someone had just thrown a gun under a car.  (Ex. 3 at 2:28-2:35; Ex. 4 at Tr. 4:12.)

#### ii.   Hester's Initial Interactions with Officer Gorman

While these 911 calls were in progress, police officers arrived on the scene of the incident. (First Mot. 5.)  Peekskill Police Officer Joseph Gorman ("Officer Gorman") was the first to arrive, and upon his arrival, he passed an individual wearing a red jacket who was walking away from

Crossroads.  (ECF No. 20-5 ("Ex. 5") at 2:00-2:10.)  After Officer Gorman parked his car, he called out to the individual in the red jacket, who stopped and turned toward him.  (*Id.* at 2:10-2:14.)  At that same time, dispatch reported that an individual was running away from the scene wearing red. (*Id.* at 2:12-2:16.)  Officer Gorman approached the individual, who would later be identified as Defendant.  (*Id.* at 2:16-2:30.)

When the two met up, Officer Gorman asked Hester if he had "hear[d] anything or seen anything," to which Hester replied "No"; Officer Gorman responded, "you didn't?", prompting Hester to confirm his answer was "No."  (ECF No. 20-6 ("Ex. 6") at 0:34-0:38.)  Officer Gorman then indicated that he wanted to talk to Hester "real quick," asked for his name, and directed him towards his vehicle.  (*Id.* at 0:39-0:42.)  Around this time, a dispatcher reported that a "gentleman threw a weapon under a vehicle."  (*Id.* at 0:44-0:46; Ex. 5 at 2:34-2:42.)  And when an officer requested additional details about the "party wearing red," another officer responded, "Gorman has him."  (Ex 6 at 0:51-0:55; Ex. 5 at 2:45-2:56.)

As they returned to the police vehicle, Officer Gorman instructed Hester to "put [his] hands up on [the] car."  (Ex. 6 at 0:52-0:59.)  Hester complied, and Officer Gorman patted him down, finding no weapons.  (*Id.* at 0:59-1:10.)  Officer Gorman held Hester on the vehicle while opening the backdoor of his car, eventually directing Hester to "take a seat for a minute."  (*Id.* at 1:12-1:17.) While Officer Gorman placed Hester in the back of his car, Hester shouted "calm down" to a female approaching the scene.[1]  (*Id.* at 1:18-1:19.)  Hester asked if he could talk to her, but Officer Gorman again instructed Hester to "sit down."  (*Id.* at 1:20-1:25.)  When Hester stated that he "didn't do nothing wrong," Officer Gorman responded, "you're not in trouble yet, alright?"  (*Id.* at 1:24-1:26.) Officer Gorman closed the door, lowering the window.  (*Id.* at 1:31-1:40.)

---

[1]      That individual would be identified as Hester's girlfriend, Alyah Brown ("Brown").

Brown continued to approach the scene frantically and several officers responded to her.[2] (*Id.* at 1:40-1:45.)  Upon seeing this, Hester asked Officer Gorman to let him calm her down, noting that he was "not going nowhere."  (*Id.* at 1:48-1:51.)  Officer Gorman requested Hester's name again, and Hester responded "Phillip Hester" while providing identification.  (*Id.* at 1:51-1:54.)  Officer Gorman again asked Hester if he had "seen anything," and again Hester responded that he had not.  (*Id.* at 2:09-2:15.)  As Hester shouted out to Brown that she should calm down, Officer Gorman indicated to Hester that he would "get to the bottom of this."  (*Id.* at 2:29-2:31.)

As Officer Gorman momentarily walked away, a separate officer asked Hester to identify his girlfriend.  (*Id.* at 5:30-5:38.)  Hester indicated which of the two females on the scene was his girlfriend, and then stated that he was "being compliant" and "not trying to do nothing wrong."  (*Id.*)  Hester then continued calling out to Brown, prompting Officer Gorman to later instruct Hester not to yell outside of the window, which he opened "as a courtesy."  (Ex. 6 at 4:21-4:25.)

Shortly after, Officer Gorman asked Hester if he had his phone on him, causing Hester to realize he had misplaced it.  (*Id.* at 5:06-5:29.)  Hester became distressed, causing Officer Gorman to eventually tell him, "I'm gonna let you know what's going on in a second.  Soon as I figure it out.  But you're not being restrained right now, you're not in handcuffs.  So just, so sit, so sit calm.  Just sit calm."  (*Id.* at 5:30-5:47.)

    *iii.*    *Law Enforcement's Investigation into the Shooting Incident*

After this exchange, an officer, identified as Chief Halmy, approached and asked Officer Gorman for details of the situation.  (*Id.* at 5:53.)  Officer Gorman explained,

> [W]hen I arrived this guy was [] walking with a purpose down this way.  He's sweating, beads of sweat, breathing heavy.  I grabbed him, threw him in the car.  Then this female [motioning toward Brown] comes running down from Lincoln Terrace

---

[2]    Brown's sister also ran onto the scene, after which officers found a knife on her.  (First Opp. 3.)  The officers then handcuffed Brown and her sister.  (Ex. 6 at 2:50-3:05.)  One of the officers, Officer Pappas, placed the knife in Officer Gorman's passenger seat.  (*Id.* at 3:16; ECF No. 20-7 ("Ex. 7") at 5:12.)

towards him.  Apparently, that's the girlfriend to this gentleman.  And then a third
female came down the street, they pulled a knife off of her.  Third female is in
that car over there.  Detectives recovered something up there in the corner [pointing
toward the Crossroads parking lot], and Sue's got somebody else stopped . . . over
there.  So I think our scene is up there.  This guy definitely has something to do with
it in the back of my car.

(*Id.* at 5:53-6:32.)[3]  When asked by a different officer if anything was needed, Officer Gorman

indicated "we might need a dog" because "someone went into the building."  (*Id.* at 6:33-6:48.)

After a minute or two, Officer Gorman walked over to a group of officers who were standing

in the parking lot and talking with a witness ("Witness-1").  (*Id.* at 8:27.)  Witness-1 stated to Officer

Gorman, "the guy that you catching [pointing toward Officer Gorman's car] . . . he, I think he put []

something either in his band, or he tried to [indicating behind his back]."  (Ex. 6 at 8:41-8:46.)

Officer Gorman acknowledged this, and, after stepping away for a few minutes, he asked Witness-

1 if he had seen "any of the fighting or anything like that?"  (*Id.* at 11:19-11:21.)  Witness-1, in

response, explained, "They were in like a conversation.  He tried to, I don't.  That was a my . . . ."

(*Id.* at 11:22-11:26.)  After clarifying he was referring to Hester, Witness-1 continued, "I think that

he was carry like a gun.  And then the other guy was told something, like a hold . . . he was very

nervous, and he then put it in his pants or something like that."  (*Id.* at 11:27-11:41.)  Witness-1

noted "there was no like [] fighting," but he did not hear what the individuals were saying;

nevertheless, he opined that "it was [] something suspicious."  (*Id.* at 12:18-12:31.)

iv.   *Hester Reports His Gun Wound*

While Hester sat in Officer Gorman's car, he realized he was shot and bleeding.  (Ex. 5 at

10:59-11:01, 11:30-11:34.)  Hester, however, did not immediately disclose this to the officers.

Instead he asked Officer Gorman to open a window or turn on the air conditioning, which Officer

---

3     During this time, Hester and Officer Michael Agovino ("Officer Agovino") conversed regarding what Hester
was doing in the area and why Brown came running to the scene crying.  As the Government does not intend
to offer any of the statements made during this conversation, the Court will not address them at this time.

Gorman declined to do.  (*Id.* at 12:16-12:36; Ex. 6 at 10:33-10:40.)  After several more minutes, Hester, potentially talking to Brown, exclaimed that his leg "hurt[]," his "leg [was] on fire," and the injury was on his hip.  (*Id.* at 14:00-14:36.)

Thereafter, Hester notified the officers that he was shot.  (*Id.* at 15:00-15:13.)  Hester initially conditioned further details on being let out of the car, but Officer Gorman urged Hester to "[s]how me what you got.  Show me what you got, and I'll call you an ambulance."  (Ex. 6 at 13:20-13:27.)  Hester complied, and Officer Gorman notified Chief Halmy of Hester's condition.  (*Id.* at 14:05-14:20.)  Chief Halmy asked if Hester said who did it, and Officer Gorman replied, "No.  He just said I got shot.  I need to get out of the car."  (*Id.* at 14:21-14:26.)  Officer Gorman further noted, "I don't have [Hester] cuffed yet because he was compliant."  (*Id.* at 14:39-14:42.)  Chief Halmy sought to find out Hester's role in the incident, but Officer Gorman could not say without Hester providing more details himself.  (*Id.* at 14:45-14:52.)

As the two men walked back to Officer Gorman's car, Chief Halmy asked if Officer Gorman knew whether Hester was "fighting with this guy or were they together and fighting with another party."  (*Id.* at 15:03-15:06.)  Officer Gorman responded with his understanding of the situation, noting the following information:

> "[Witness-1] said [Hester] was having an argument with the guy Sue stopped.  They went over in this area over here, generally. . . .  He thinks that [Hester] had something stuck in his waist band.  But they're both wearing similar clothes I believe, so I don't know if he was confused on that."

(*Id.* at 15:05-15:20.)  The two men then turned their attention back to Hester, with Officer Agovino explaining that Hester is "not really bleeding a lot" but he had an injury.  (*Id.* at 15:26-15:32.)

Over the next several minutes, officers inspected Hester's wounds and they eventually determined that he should be transported to the NewYork-Presbyterian Hudson Valley Hospital (the

"Hospital").[4]  (Ex. 5 at 16:00-19:45.)  Officer Gorman then returned to his vehicle, opened the door

to inspect Hester's wound himself, and entered the driver's seat to take Hester to the Hospital.  (Ex.

6 at 19:14-20:05.)  Officer Agovino accompanied him on this trip.  (*Id.* at 18:40, 19:14.)

      *v.   Subsequent Investigation and Interrogation of Individual-1*

As explained by the Government, and not disputed by Defendant, officers collected

additional statements from eyewitnesses around the time Hester was taken to the Hospital.  (First

Opp. 5.)  One such witness ("Witness-2") gave a sworn deposition at 11:45 a.m., stating that while

he was outside of 1107 Brown Street at approximately 11:00 a.m., he saw a young medium skin,

dark hair, medium built, African American male wearing a red jacket, walking fast alongside the

building, and holding a black object in his right hand that looked like a black gun.  (*Id.*)  According

to the complaint that was later filed, Witness-2 (as well as Witness-1) observed that the individual

in the red jacket met another man (Individual-1) in the parking lot, and at some point, Witness-2 saw

Individual-1 throw a gun underneath a van.[5]  (*Id.* at 6.)  An officer eventually stopped Individual-1

and the gun at issue was found underneath a nearby car.  (*Id.*)

Individual-1 was taken to the Peekskill Police Department for questioning.  (*Id.* at 7.)  He

indicated that he met Hester in the parking lot of Crossroads and saw something black in Hester's

hand.  (*Id.*)  He then saw a black handgun on the bumper of the car where they were standing, and

the black object was no longer in Hester's hand.  (*Id.*)  Individual-1 explained that, once police sirens

were audible, Hester pointed to the gun and said "police."  (*Id.*)  Knowing that Hester was on

probation, Individual-1 grabbed the gun, walked to another car in the parking lot, and threw it under

the car.  (*Id.*)  Hester had also given Individual-1 his cellphone.  (*Id.*)

---

[4]    The dashboard camera reveals that, during this period, an unidentified officer asked Hester a series of questions to ascertain where he had been shot and who had shot him.  Because the Government has indicated that it does not intend to offer any of these statements, the Court does not address this conversation.

[5]    Witness-1 had also observed the two men fumbling with something behind a car.  (First Opp. 6.)

> vi.   *Brown and Hester are Taken into Custody*

While Hester was transported to the Hospital, Brown was taken to the police station.  (First Mot. 5.)  In her affidavit, Brown states that, upon arriving to the police station, she was questioned by police.  (Aff. of Alyah Brown ("Brown Aff."), ECF No. 18-1, ⁋ 5.)  During the interrogation, Brown affirms, investigators indicated that they had various phones in their possession but were not sure which phone belonged to Hester.  (*Id.* ⁋ 6.)  Investigators further noted that they believed a video of the shooting was on Hester's phone.  (*Id.* ⁋ 8.)  After Brown refused to provide Hester's password, investigators provided her a white iPhone to ascertain whether the video of the shooting was on the phone.  (*Id.* ⁋⁋ 10-12.)  Brown searched the phone in the presence of the investigators but did not find any video.  (*Id.* ⁋⁋ 13-15.)  Brown informed investigators and returned the phone in the locked position.  (*Id.* ⁋⁋ 16-18.)

Separately, at approximately 4:00 p.m., Hester was discharged from the Hospital and taken to the Peekskill Police Department.  (*Id.*)  Two hours later, around 5:50 p.m., Hester was read his *Miranda* rights, but he declined to make a statement.  (*Id.*; First Mot. 5.)  Hester did not separately request to speak with counsel at that time.  (Gov't Mem. of Law in Opp. to Defs. Second Mot. to Supp. ("Second Opp."), ECF No. 31, at 4.)

**B.  Defendant's April 3, 2019 Statements to Law Enforcement**

The next morning, Special Agent Dellapia ("Agent Dellapia") and Officer Joseph McGann ("Officer McGann") transported Hester to the Federal Bureau of Investigation's ("FBI") office for initial processing and then to the court for an initial presentment.  (*Id.*)  According to the Government's memorandum, Agent Dellapia and Officer McGann both have represented that during the drive, Hester, unprompted, began discussing the prior day's events.  (*Id.*)  Hester first asked where he was being taken and why he was being charged.  (*Id.*)  Agent Dellapia and Officer McGann

revealed that Hester was being charged with a federal gun crime.  (*Id.*)  After expressing surprise, Hester recounted the April 2, 2019 incident.  (*Id.*)

Hester explained that he had been walking to Brown's house when he thought he saw a girl who had gotten in a fight with Brown.  (*Id.*)  Hester followed that girl up the stairs to the vicinity of Crossroads and saw that the girl was with a "masked guy."  (*Id.*)  Hester was aware of this masked individual's identity but did not want to disclose that information to law enforcement.[6]  (*Id.*)  In response, Agent Dellapia asked how he could identify someone wearing a mask.  (*Id.*)  Hester noted the individual's size, clothes, and tattoo, as well as the fact that the man stated "you should've killed me when you had the chance" prior to the incident.  (*Id.*)  According to Hester, the masked individual pulled a gun on him and said "run," ultimately shooting Hester in the leg.  (*Id.*)  The masked individual gave the gun to the girl, who in turn also shot at Hester.  (*Id.*)  Hester noted that he likes guns, so he knew that he had been shot by a .32 revolver.  (*Id.*)  Hester then stated that, after the shooting, he ran to the parking lot to meet his friend.  (*Id.*)

Hester asked at some point whether his friend had been arrested, remarking that he had nothing to do with the shooting.  (First Opp. 6.)  Hester then asked, according to the Government, "he walks if I cop to the whole thing, right?"  (Second Opp. 5.)  Agent Dellapia explained that he should have his lawyer contact the Government's lawyer if he wanted to talk about that issue further.[7]  (*Id.*)

---

[6]   As later detailed in the criminal complaint filed against Hester, that individual was Max Nieves.  (ECF No. 1.)

[7]   Although the Government has not proffered an affidavit from either Agent Dellapia or Officer McGann, Defendant does not specifically dispute the Government's version of events.  Rather, Defendant summarily states that he was (1) "questioned[] without being provided new Miranda warnings [and] not having waived his right to counsel" (Def. Mem. of Law in Supp. of Second Mot. to Suppress ("Second Mot."), ECF No. 23, at 4-5), and (2) "transported to Federal court for an arraignment in the back of a locked law enforcement vehicle," where he was "questioned, without being provided new *Miranda* warnings, not having waived his right to remain silent or waved [sic] his right to have an attorney present during questions, not free to leave or terminate the interaction" (Def. Reply in Supp. of Second Mot. ("Second Reply"), ECF No. 32, at 5.)

### C. Defendant's April 4, 2019 Conversations with Brown[8]

On April 4, 2019, while incarcerated at the Westchester County Correctional Facility ("WCF"), Hester placed two calls to Brown.  At the beginning of each call, participants were informed that the "call [was] from a corrections facility and [was] subject to monitoring and recording."  (ECF No. 20-8 ("Ex. 8") at 0:57-1:02; ECF No. 20-9 ("Ex. 9") at 0:54-0:58.)

During the first call, occurring around 9:40 a.m., Hester indicated to Brown that he was "looking at a lot of time right now" and that Individual-1 "told on me. . . .  He's witness number three."  (Ex. 8 at 1:22-1:32.)  After a few minutes of conversation, Hester indicated that Individual-1 "got my phone," to which Brown responded, "[Individual-1] said he didn't have your phone."  (*Id.* at 4:12-4:15.)  Hester then stated, "so now it's in evidence then, they got it in evidence.  The video of me getting shot is on my phone."  (*Id.* at 4:17-4:21.)  Brown continued, "They tried to make me give them your password and I was like, 'No.'"  (*Id.* at 4:26-30.)  After telling Brown "don't do that," the following exchange occurred:

> **Hester**: You gotta, um, sign into my iCloud, um, delete like . . .
>
> **Brown**: Erase the phone?
>
> **Hester**: No. Don't erase the phone, just delete like the . . .
>
> **Brown**: I, no, what I did I put it in lost mode so when it is found nobody can get into it.
>
> **Hester:** Alright, but they sending it over to the D.A.'s office so they can try to get into it.
>
> **Brown**: So, what should I do?

---

[8] Defendant points to the existence of several other alleged calls between a "Man" (presumably Hester) and an unspecified "Woman," which occurred on April 18, 2019 and April 27, 2019, respectively.  (Defs. Reply in Supp. of First Mot. ("First Reply"), ECF No. 21, at 7-8.)  Defendant has represented that, during the April 18 call, the "Man" maintained his innocence to the woman.  (*Id.* at 7.)  During the April 27 call, Defendant has alleged, the "Man" calls into question the truthfulness of an unspecified individual's statement to law enforcement.  (*Id.* at 7-8.)  Although Defendant questions how the Government obtained these calls, which are not before the Court, their relevance to the resolution of his present motions is not apparent.

> **Hester**: *Delete anything incriminating*.  Don't delete the video of me getting
> shot.  I got the whole video of me getting shot with they faces and all
> that in it.

(*Id.* at 4:30-4:58 (emphasis added).)   In response, Brown explained, "I went in your phone and I

couldn't find [the shooting video] at all."   (*Id.* at 4:58-5:08.)   After Brown detailed her interaction

with law enforcement regarding the phone, Hester speculated that the phone may have died prior to

the video saving.[9]   (*Id.* at 5:09-5:33.)   Then towards the end of the phone call, Hester told Brown to

"clear my bank account.   Get a $100 iPhone, the six, and then, like, you remember the pin . . .

basically say that the phone is lost but you still want the same number. . . .   Then put money on that

phone."   (*Id.* at 6:37-7:00.)

Later in the day, Hester called Brown again.   At the end of that call, Brown remembered that

she had not "erase[d] [Hester's] phone yet."   (Ex. 9 at 19:54-19:58.)   With the call ending, Brown

explained, "I gotta get the job first, I gotta get a phone too, and I'm gonna erase your phone tonight."

(*Id.* at 20:02-20:08.)   Hester responded that Brown should "take [her] time with everything, except

for [] erasing the phone, [she] gotta do that ASAP."   (*Id.* at 20:09-20:14.)   When asked for

clarification, Hester reiterated, "I said take your time with everything except for that last part [erasing

the phone], ok?"   (*Id.* at 20:16-20:19.)

### D.   The Cellphone Search Warrants

On April 11, 2019, Agent Dellapia applied to the Honorable Paul E. Davison for a warrant

to search Hester's cellphone.   (ECF No. 20-10 ("Ex. 10") at 5[10].)   The specific device to be searched

was a "White iPhone 6, Model A 1586, IC 579C-E2816A" ("Hester's Phone") that was "seized from

---

[9]   At this point, the conversation shifted back to what Individual-1 told law enforcement.   (Ex. 8 at 5:34.)   Hester explained to Brown, "[Individual-1] told that I had the gun on me, that he was walking with me, that I put the gun on the bumper and pointed it to the bumper.   And so he knew I was on probation, so he picked up the gun and ran with it and threw it under a car."   (*Id.* at 5:36-5:50.)   Brown responded, "wow, bro, wow, he told everything like that.   He told exactly what happened, bro."   (*Id.* at 5:51-5:58.)

[10]   Pagination for Exhibit 10 refers to the pagination for ECF No. 20-10, rather than the document-specific pagination for the documents collected within that exhibit.

Phillip Hester on April 2, 2019 pursuant to his arrest by the Peekskill Police Department." (*Id.* at 4 (Attachment A).)  Notably, the purpose of the search warrant was to obtain evidence of alleged criminal conduct regarding not only Hester but also Max Nieves, who would later be charged in connection with the April 2, 2019 shooting. (*Id.* at 7-8, 12; *see also United States v. Nieves*, No. 19-cr-402-NSR-1, ECF No. 6 (S.D.N.Y. June 3, 2019).)

In support of the application, Agent Dellapia submitted an affidavit outlining the probable cause for both the "subject offenses" and "subject device," *i.e.*, Hester's Phone (the "April 11 Affidavit"). (Ex. 10 at 6, 8, 11.)  When outlining probable cause to search Hester's Phone, Agent Dellapia explained that, "[b]ased on [his] conversations with law enforcement," he had learned that arresting officers had recovered the subject device from Hester during the arrest. (*Id.* at 11 ⁋ 20.) He then noted that there was probable cause to believe that Hester's phone had evidence of the subject offenses given witness observations that Hester used his phone to record the events of April 2, 2019. (*Id.* ⁋ 21)  Agent Dellapia also relied on his experience that "individuals who unlawfully possess and transfer firearms often store records"—such as photographs, videos, text messages, emails, or social media messages—"relating to their illegal activity and to persons involved with them in that activity on electronic devices," such as cellphones. (*Id.* ⁋ 22.)  At bottom, Agent Dellapia affirmed that the evidence "may establish . . . the 'who, what, why, when, where, and how' of the criminal conduct," or "alternatively, [] exclude the innocent from further suspicion." (*Id.*)

Magistrate Judge Davison signed the search and seizure warrant at 1:59 p.m. on April 11, 2019. (*Id.* at 2.)  However, as the Government explains, law enforcement never executed the warrant. (First Opp. 9.)  Instead, on April 15, 2019, Agent Dellapia submitted a new application for a search and seizure warrant to search Hester's Phone. (ECF No. 20-11 ("Ex. 11") at 5[11].)  Agent

---

[11]    Pagination numbering for Exhibit 11 refers to pagination for ECF No. 20-11, rather than the document-specific pagination for the documents collected within that exhibit.

Dellapia also submitted an affidavit as part of this second application (the "April 15 Affidavit").  (*Id.* at 6.)  Although much of the content was the same, there were three relevant changes.

*First*, Agent Dellapia added in a footnote explaining the reasoning behind this second search warrant application.  (*Id.* at 6 ⁋ 1 n.1.)  As Agent Dellapia explained,

> On April 11, 2019, the Honorable Paul E. Davison issued a search warrant for [Hester's Phone] which has not been executed.  I subsequently realized that [Hester's Phone] was seized from the individual identified as Witness 3 in Attachment B and not from PHILLIP HESTER.  However, for reasons stated herein, I believe the Subject Device belongs to PHILLIP HESTER.  I also subsequently learned that a woman who identified herself as PHILLIP HESTER's girlfriend attempted to find a video of the events of April 2, 2019 on [Hester's Phone], but was unable to do so.  However, she did not keep [Hester's Phone] unlocked for long enough for Peekskill Police Officers to check the phone themselves.  Accordingly, I submit this revised affidavit to correct and include this information.

(*Id.*)

*Second*, Agent Dellapia amended paragraph 20 of the affidavit to state that "[b]ased on my conversations with law enforcement, I learned that [a] Peekskill Police Officer seized [Hester's Phone] from the individual identified as Witness 3 in Attachment B."  (*Id.* at 11 ⁋ 20.)  This change was consistent with the explanation provided in the April 15 Affidavit's footnote.

*Finally*, Agent Dellapia added in a new paragraph to provide the following explanation for why he believed the device at issue was Hester's Phone:

> I believe the Subject Device belongs to PHILLIP HESTER because: 1) Peekskill Police Officers stated that on the home screen of the SUBJECT DEVICE is a picture of PHILLIP HESTER and they were able to identify PHILLIP HESTER in the photograph because of his prior interactions with the Peekskill Police Department and he was in their custody at the time; 2) PHILLIP HESTER told Peekskill Police Officers that he had a white iPhone with a blue and red case, which matches the description of the Subject Device; and 3) an individual who identified herself as the girlfriend of PHILLIP HESTER came to the Peekskill Police Department and identified the Subject Device as the phone belonging to PHILLIP HESTER.  In addition, on or about April 2, 2019, Witness 3 told me that PHILLIP HESTER had given him the Subject Device on April 2, 2019, shortly before Witness 3 was detained by the Peekskill Police Officers.

(*Id.* at 11-12 ⁋ 21.)

That same day, at 3:03 p.m., Magistrate Judge Davison signed the new search and seizure warrant, authorizing the search of Hester's Phone.  (*Id.* at 2.)  Law enforcement executed the search of the phone but found no data on it.  (First Opp. 9.)

### E.  The iCloud Search Warrant

On July 12, 2019, Officer McGann submitted an affidavit in support of a search warrant for Hester's iCloud account (the "iCloud Affidavit").  (ECF No. 31-1 ("Ex. 12").)  The search of the iCloud account was also intended to find information regarding Hester and Max Nieves.  (*Id.* ¶¶ 4-5.)  In addition to relying on the facts detailed in the criminal complaints filed against Hester and Max Nieves (attached to the affidavit) (*id.* ¶¶ 9-12), Officer McGann also relied on information contained in the April 15 Affidavit (also attached to the affidavit) (*id.* ¶ 13).  Officer McGann did not specifically mention the April 11 Affidavit or attach it to the iCloud Affidavit.  (Second Mot. 6.)

Officer McGann outlined the new facts supporting probable cause to search the iCloud account.  Officer McGann first explained how a search of Hester's phone revealed that there was no data on it, indicating that the device had been "wiped clean."  (Ex. 12 ¶ 15.)  Officer McGann then indicated that he learned about the April 4, 2019 calls between Hester and Brown, including Hester's instruction to Brown to "delete anything incriminating" on his phone.[12]  (*Id.* ¶¶ 16-18.)

Officer McGann then explained why there was probable cause to find erased information in the iCloud Account.  Officer McGann first averred, although "iPhones can be remotely erased," the information can nevertheless be backed up and retained in the iCloud account stored on Apple's servers.  (*Id.* ¶¶ 19-20.)  Officer McGann then explained that law enforcement was able to obtain

---

[12]  As Defendant notes, Officer McGann did not include the portion of the conversation where Hester instructed Brown to not "delete the video of me getting shot."  (Second Mot. 7.)  Similarly, the iCloud Affidavit provides a slightly different account, as compared to the facts stated in the Brown Affidavit, regarding the circumstances surrounding Brown's search of Hester's phone during the police investigation.  (*Id.*)

records related to Hester's iCloud account, which indicated that the account was "full and active."

(*Id.* ⁋ 22.)  Officer McGann continued,

> Based on my conversations with Officer 1, I know that from the time that the Peekskill Police Officers seized [Hester's Phone] on the morning of April 2, 2019 through the present, [Hester's Phone] has been maintained in possession, custody, and control of law enforcement.  Based on my conversation with Officer 1, I also know that on or about April 2, 2019, [Brown] asked to see [Hester's Phone] to check for a video and Peekskill Police Officers allowed her to unlock the Device and view it for a short period of time in the presence of the Peekskill Police Officers.

(*Id.* ⁋ 24.)  Overall, McGann concluded, because Apple maintains records regarding the Find My iPhone service, there was probable cause that Hester's iCloud account would contain information about if or when Hester's Phone was erased and the location of the user who did it.  (*Id.* ⁋⁋ 25-26.)

Relying on the iCloud Affidavit and its attached exhibits, Magistrate Judge Davison signed the warrant, thereby authorizing the search of Hester's iCloud account.  (Second Opp. 8.)

## II.   Procedural History

On April 3, 2019, a criminal complaint was filed, charging Defendant with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).  (ECF No. 1.)  Defendant appeared before the Honorable Judith C. McCarthy and was detained without prejudice.  (ECF No. 2.)  Thereafter, Hester was formally indicted by a grand jury on April 30, 2019.  (ECF No. 6.)  Count One of that indictment charged Hester with possessing a firearm, on or about April 2, 2019, after having a felony conviction, in violation of 18 U.S.C. § 922(g).  (*Id.*)

On July 23, 2019, a grand jury returned a two-count superseding indictment (the "Indictment"), which added a second count charging Hester with obstructing justice, in violation of 18 U.S.C. § 1512(c).  (SI ⁋ 2.)  The Indictment specifically charges that, on or about April 4, 2019, after his arrest, Defendant provided the password associated with his white Apple iPhone 6 to another individual and asked the individual to destroy and conceal data on the phone, knowing the data was relevant to a federal criminal proceeding.  (*Id.*)

15

On January 20, 2020, following a pre-trial conference on December 4, 2019, Defendant filed his first motion.  (ECF No. 16.)  In this motion, Defendant sought to suppress (1) statements made on April 2, 2019 to law enforcement while he was detained and placed in the rear of Officer Gorman's patrol car, (2) statements made to law enforcement while he was at the Hospital receiving medical attention, (3) evidence derived from the Government's seizure of Defendant's cellphone, and (4) the statements made to Brown during their April 4, 2019 jail call at WCF.  (First Mot. 1-2.)  Defendant further sought a *Franks* hearing to challenge the affidavit supporting the application for the search warrant for Defendant's cellphone.  (*Id.*)  Finally, Defendant moved to sever the two counts of the Indictment.  (*Id.* at 2.)  The Government opposed Defendant's motion on February 24, 2020 (ECF No. 20), and Defendant filed his reply on March 10, 2020 (ECF No. 21.)

The next month, Defendant filed a second motion to suppress.  (ECF No. 23.)  In this motion, Defendant sought to suppress statements he made to law enforcement on April 3, 2019 while being transported to the FBI's office and the court.  (Second Mot. at 1.)  Defendant also sought a separate *Franks* hearing to challenge the affidavit used to obtain a search warrant for Defendant's iCloud account.  (*Id.*)  On April 17, 2020, as it had not previously contemplated this second motion, the Court set a briefing schedule for the parties.  (ECF No. 26.)  The Government filed its opposition on May 8, 2020 (ECF No. 30), and Defendant replied on May 15, 2020 (ECF No. 32).

This opinion followed.

## DISCUSSION

### I.   Defendant's Motion to Suppress

#### A.  Defendant's Request for a Suppression Hearing

Defendant has requested that a hearing be held to present evidence as to why the Court should suppress his statements to law enforcement, his statements made to Brown during their calls on April

4, 2019, and his cellphone.  (First Mot. 23; Second Mot. 10, 13.)  In response, the Government

argues that Defendant has failed to establish a factual dispute that would warrant a hearing.  (First

Opp. 19; Second Opp. 14.)  The Court agrees.

"An evidentiary hearing on a motion to suppress ordinarily is required only if 'the moving

papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude

that contested issues of fact going to the validity of the search are in question.'"  *United States v.*

*Filippi*, No. 12 Cr. 604(RA), 2013 WL 208919, at *9 (S.D.N.Y. Jan. 16, 2013) (quoting *United*

*States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992)).  A defendant may not rely on "bald assertions,"

and "[w]ithout specification of the factual basis" that supports suppression, "the district court is not

required to have a hearing."  *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998); *see also*

*United States v. Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) ("A hearing is not required if the

defendant's statements are general, conclusory or based on conjecture.").  Moreover, although the

Government's reliance on "unsworn statements" in its Memorandum of Law may generally not be

enough for a court to make a finding of fact, *see United States v. Marquez*, 367 F. Supp. 2d 600, 603

(S.D.N.Y. 2005), a defendant nevertheless bears the initial burden of establishing, by an affidavit of

someone with personal knowledge of the underlying facts, that there are, in fact, disputed issues of

material facts, *Viscioso*, 711 F. Supp. at 745 (citing *United States v. Caruso*, 684 F. Supp. 84, 87

(S.D.N.Y. 1998)).  "[A]n attorney's affidavit, absent personal knowledge[,] is insufficient to justify

a suppression hearing."  *United States v. Cook*, 348 F. Supp. 2d 22, 28 (S.D.N.Y. 2004)

Here, a review of the parties' submissions indicates that there is no basis for a suppression

hearing.  As it relates to Defendant's motion to suppress his statements made to law enforcement on

April 2, 2019 prior to his transport to the Hospital, the Government has provided the Court with 911

call records, dashboard camera video recordings, and body camera video recordings, all of which

allow the Court to accurately assess the context and voluntariness of the statements at issue. Conversely, Defendant only offers an affirmation by his counsel, who does not purport to have personal knowledge of the events of April 2, 2019.  (*See* Aff. of Jesse Hoberman-Kelly in Supp. of First Mot., ECF No. 17, ¶ 4 ("All statements herin [sic] are made upon information and belief and my review of documents and other evidence in this case unless otherwise indicated.").)  In any event, Defendant's "version of events is not inconsistent with that stated" by the Government or depicted in the exhibits.  *See Viscioso*, 711 F. Supp. at 745-46 (concluding that a suppression hearing was not warranted where defendant's "version of the events [was] not inconsistent with that stated in the complaint and the [investigating officer's] affidavit" submitted by the Government).

A similar conclusion is warranted regarding the facts underlying Defendant's seizure. Defendant's version of events is not inconsistent with the circumstances that are clearly established by the video and audio evidence, as well as the Government's accounting of the events.  As there is no material factual dispute regarding what information officers had prior to, and upon, arriving at Crossroads and the information gathered thereafter, no suppression hearing is warranted as to the probable cause issue.

Finally, a suppression hearing is not warranted regarding Defendant's statements made on April 3, 2019.  As Defendant acknowledges, to "raise a factual issue to be determined at a hearing," he must submit "admissible evidence which, if credited, would make out a *prima facie* case" about what transpired during his transportation.  *United States v. Ahmad*, 992 F. Supp. 682, 685 (S.D.N.Y. 1998).  Defendant has not done so here.  Rather, in his Second Motion, Defendant simply states that "[d]uring [the April 3, 2019] transport he was again questioned, without being provided new

Miranda warnings, not having waived his right to counsel."[13]  (Second Mot. 4-5.)  At no point does Defendant indicate what statements he contends are at issue or what questions were asked.  Nor does he offer an affirmation of any individual with *personal knowledge* of what transpired during his transportation (including himself).   More tellingly, although Defendant takes issue with the Government's reliance on unsworn statements about the April 3, 2019 transport, he does not seriously attempt to rebut the Government's version of events.  *See United States v. Perryman*, No. 12-CR-0123 (ADS), 2013 WL 4039374, at *6 (E.D.N.Y. Aug. 7, 2013) (denying motion to suppress and request for hearing where defendant "ha[d] not submitted an affidavit based upon his personal knowledge, rebutting the Government's version of events").  Instead, he merely reiterates, without any further support, the same, unparticularized assertion that he was questioned without a *Miranda* warning.  Plainly stated, without more, this bare assertion falls short of establishing a "sufficiently factual and specific" basis to warrant a hearing.  *Mathurin*, 148 F.3d at 69; *see also United States v. Gutierrez*, No. 02 CR. 1312(DAB), 2003 WL 21222377, at *3-4 (S.D.N.Y. May 27, 2003) (denying motion to suppress without a hearing where defendant offered no evidentiary support for her assertion that "she was arrested[,] . . . questioned by [] officers immediately prior to her arrest[, and] after she was in fact placed under arrest she was then given her *Miranda* warnings").

In short, the Court DENIES Defendant's request for a suppression hearing.  It now turns to the substance of Defendant's motions.

## B.  Defendant's Challenge to the Propriety of His Seizure and Arrest

Defendant primarily challenges the lawfulness of his seizure and eventual arrest as the basis for suppressing many of the statements and evidence encompassed by his motions.  The Government

---

[13]   To support this fact, Defendant offers an affirmation by his counsel, who, again, does not have personal knowledge of the underlying facts.  At any rate, as opposed to providing new, specific facts, counsel makes the same unparticularized statement.  (*See* Aff. of Jesse Hoberman-Kelly in Supp. of Second Mot., ECF No. 24, ¶ 3.)

retorts that Defendant's initial seizure was a lawful *Terry* stop and that his eventual arrest was supported by probable cause. (First Opp. 10-18.) The Court agrees.

Under *Terry v. Ohio*, 392 U.S. 1 (1968), "a police officer may briefly detain an individual for questioning if the officer has 'a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.'" *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008) (quoting *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)). An officer has a reasonable suspicion when he or she is "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). "[T]he amount of suspicion needed to justify the encounter is less than a 'fair probability' of wrongdoing, and 'considerably less than proof of wrongdoing by a preponderance of evidence.'" *Padilla*, 548 F.3d at 186-87 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). The "reasonable suspicion" inquiry requires courts to "look to the totality of the circumstances." *United States v. Pena*, 351 F. Supp. 3d 723, 729 (S.D.N.Y. 2019) (internal citations).

Here, there was a sufficient basis to warrant Defendant's initial stop. When Officer Gorman had arrived on the scene, 911 had already received two separate calls from individuals who had witnessed the April 2, 2019 shooting, and both reported that one of the individuals involved was wearing a red jacket. (Ex. 1 at 3:14-3:22; Ex. 3 at 1:00-1:08.) Both calls were recorded and in both instances the caller provided his or her name and contact information, thereby bolstering credibility. *See, e.g.*, *United States v. Peterson*, No. 12 Cr 409(PAE), 2012 WL 4473298, at *7-8 (S.D.N.Y. Sept. 28, 2012) ("Under these circumstances, the officers reasonably could have a fair degree of confidence in the 911 Caller's account, because the Caller was on the scene, at an identifiable apartment number, and could be held to account, then and there, for his statements."). Moreover, when Officer Gorman arrived, he was informed by dispatch that there was "another individual

20

running away from Brown Street towards the firehouse, wearing red," and it was "unknown if that party was armed." (Ex. 5 at 2:11-2:18.) Defendant, in turn, matched that same description (*id.*), and as Officer Gorman noted to Chief Halmy, Defendant was observed "walking with a purpose," "sweating," and "breathing heavy." (Ex. 6 at 5:53-6:32.) When adding in the fact that shots fired had been reported in the vicinity shortly before arrival, there were more than enough articulable facts and inferences that would support a reasonable suspicion necessitating a *Terry* stop of Defendant. *See United States v. Timms*, No. 17-cr-130 (KBF), 2017 WL 3503373, at *5 (S.D.N.Y. Aug. 16, 2017) (concluding that, based on the "totality of circumstances," the investigatory stop was reasonable, where officers relied on information from a reliable source and observed a situation in which it was unclear whether they were approaching armed and dangerous individuals).

To continue to pass constitutional muster, however, "the ensuing investigation must [have] be[en] reasonably related in scope and duration to the circumstances that justified the stop in the first instance." *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992). Although a closer call, the Court concludes that the totality of the circumstances supported Defendant's detainment in the back of Officer Gorman's vehicle, and it did not convert into an arrest until, at the very least, he was at the hospital.

In general, if a "stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a *de facto* arrest that must be based on probable cause." *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). To determine whether an investigatory stop has become an arrest, courts will look at the following factors: "(1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons." *United States v. Fiseku*,

915 F.3d 863, 870 (2d Cir. 2018) (quoting *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004)).  "No one of these factors is determinative.  But to satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ the least intrusive means reasonably available to effect their legitimate investigative purposes." *Newton*, 369 F.3d at 674.

Here, it is true that Defendant, who Officer Gorman determined was unarmed at the time, was placed into the back of the police car, in turn restricting his freedom to move around.  But equally weighty are the facts that (1) Officer Gorman had enough information, based on his own personal observations and information reported by dispatch, to infer that Defendant was involved in the reported incident in some capacity, (2) Defendant was not otherwise restrained and had a window open for him to communicate (albeit, sometimes limitedly) with those outside of the car, and (3) Officer Gorman used no force beyond a brief pat down and never drew a gun on Defendant.  And although at that point officers were still assessing what had transpired, it remains relevant that they were responding to a "shots fired" incident that had occurred shortly before their arrival on the scene and were aware of at least one weapon being discarded in the vicinity of the incident.  Courts, when faced with similar circumstances implicating safety, have concluded that the amount of restraint used in this type of situation does not cross the line from investigatory stop to *de facto* arrest.  *See, e.g.*, *United States v. Santillan*, 902 F.3d 49, 53-54, 62 (2d Cir. 2018) (concluding that an investigatory stop, which lasted approximately 80 minutes, did not ripen into a *de facto* arrest where, after a traffic stop, defendant was pat down, asked to sit in back of a patrol car, and questioned, resulting in officers calling in a "narcotics canine" to the scene); *United States v. Forte*, 412 F. Supp. 2d 258, 265 (W.D.N.Y. 2006) (concluding that an investigatory stop did not convert into a *de facto* arrest where the officer approached defendant in high crime area, employed minimal force by directing defendant out of his car without drawing a weapon, and secured defendant in the back of

the police vehicle to pursue his investigation).  Nor does the fact that Defendant's detention lasted for approximately 20 minutes alter this conclusion, particularly where a portion of this time involved some officers responding to Defendant's injury and determining whether to take him to a hospital. *See United States v. Sharpe*, 470 U.S. at 685 (concluding that 20-minute detention did not convert investigatory stop into *de facto* arrest).

Finally, by the time Defendant was at the hospital, if not before, the officers had probable cause to make an arrest.  An arresting officer "ordinarily has probable cause to arrest when he or she 'ha[s] knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'"  *United States v. Diaz*, 854 F.3d 197, 203 (2d Cir. 2017) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010)).  "Probable cause 'requires neither a prima facie showing of criminal activity nor a showing that evidence of crime will more likely than not be found.'"  *United States v. Taylor*, No. 11 Cr. 310(PGG), 2011 WL 4357350, at *4 (S.D.N.Y. Sept. 19, 2011) (quoting *United States v. Rodriguez*, No. S1 07 Cr. 699(HB), 2008 WL 52917, at *5 (S.D.N.Y. Jan. 2, 2018)).  Rather, a finding of probable cause "requires only a probability or substantial chance of criminal activity."  *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)); *United States v. Medina*, 19 F. Supp. 3d 518, 532 (S.D.N.Y. 2014) ("The quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction, but it must constitute more than rumor, suspicion, or even a 'strong reason to suspect.'" (quoting *Fisher*, 702 F.2d at 378)).

Here, near the end of Defendant's detention at the scene of the incident, officers had amassed a wealth of information that would have supported Defendant's arrest.  As noted above, by the time

officers had arrived on the scene, they were aware—based on information from 911 calls—that an individual who matched Defendant's profile had been involved in a shooting incident.  Officer Gorman then arrived at the scene and observed Defendant walking quickly away from the vicinity and breathing heavily, with his girlfriend and her sister arriving shortly after in a frantic manner. Although he did not find a weapon on Defendant, Officer Gorman had then become aware that a weapon had been discarded under a vehicle in the parking lot.  (Ex. 5 at 2:34-2:42; Ex. 6 at 0:44-0:46.)  Officer Gorman subsequently learned that Witness-1 had observed Defendant potentially with a weapon in his pants or at least carrying a gun, and that he and another individual were acting suspiciously. (Ex. 6 at 11:22-12:31.)   And at 11:45 a.m., Witness-2 testified to witnessing the individual in the red jacket—again matching Defendant's description—meet another man in the parking lot, and at some point, Witness-2 saw the other male throw a gun under a car (First Opp. 5). These facts, when viewed in their totality, support a conclusion that there was sufficient information available to allow a person of reasonable caution to believe that an offense had been committed.

The Court now turns to the specific items that Defendant seeks to suppress.

### C.  Defendant's Statements to, or in the Presence of, Law Enforcement

Under *Miranda v. Arizona*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."[14]  384 U.S. 436, 444 (1966).  "'[C]ustody' for Miranda purposes is not coterminous with . . . the colloquial understanding of custody."  *United States v. FNU LNU*, 653 F.3d 144, 152-53 (2d Cir. 2011).  The test for determining custody is an objective inquiry that asks (1) "whether a reasonable person would

---

[14]    Specifically, under *Miranda*, law enforcement must "advise a suspect that 'he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'"  *United States v. Schaffer*, 851 F.3d 166, 173 n.23 (2d Cir. 2017) (quoting *Miranda*, 384 U.S. at 444).

have thought he was free to leave the police encounter at issue" and (2) whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Newton*, 369 F.3d at 672 (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994); *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

It is, however, not enough under *Miranda* for a suspect to be in custody; rather, *Miranda*'s procedural safeguards are specifically triggered "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). "Absent an interrogation, there can be no infringement of the Fifth Amendment rights *Miranda* was designed to protect." *Jackson v. Conway*, 763 F.3d 115, 137 (2d Cir. 2014) (citing *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)).

"Not all questioning of a suspect by the police amounts to interrogation." *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017). For example, "officers may permissibly ask questions, such as why the subject is at that location, and may make requests for identifications." *United States v. Compton*, 830 F.3d 55, 65 (2d Cir. 2016) (internal citations and quotations omitted). Similarly, "'pedigree' questions that pertain to administration or a defendant's basic identification information do not trigger *Miranda*." *Familetti*, 878 F.3d at 57-58. Separately, a "spontaneous or volunteered utterance by a suspect, even though in custody and having been subjected to prior questioning, is not the product of custodial interrogation, and is thus not subject to suppression under *Miranda*." *United States v. Fiseku*, No. 15 Cr. 384 (PAE), 2015 WL 7871038, at *15 (S.D.N.Y. Dec. 3, 2015) (citing *United States v. Colon*, 835 F.2d 27, 28, 30 (2d Cir. 1987)).

Here, Defendant seeks to suppress (1) "all statements and their fruits" emanating from his confinement in the back of Officer Gorman's car (First Mot. 23), (2) "all statements and their fruits" emanating from his alleged interrogation at the Hospital (*id.* at 24), and (3) "all statements made . . .

25

to law enforcement on April 3, 2019 (Second Mot. 10).  The Government, in response, has represented that, in addition to the statements made on April 3, 2019, it only intends to offer those statements related to "the fact that Hester told law enforcement that he had not seen anything," that he "knew he had been shot and was in pain," and that he "debated whether to tell the police" about his injury.  (Second Opp. 9-10, 12-18.)  The Government otherwise indicates that it does not intend to admit any other statement Defendant made while detained in the back of Officer Gorman's car or any of the statements made at the Hospital.  (First Opp. 19; Second Opp. 3 & 3 n.1.)

Given the Government's representations, the Court will confine its suppression analysis to Defendant's statements regarding his gunshot wounds, and Defendant's statements to Agent Dellapia and Officer McGann made on April 3, 2019.[15]  Furthermore, although it is unclear if Defendant intended to include these as part of his motion, the Court will also address those statements he made to Officer Gorman prior to being detained in the police vehicle.

       i.     *Statements Made to Officer Gorman Prior to Detainment on April 2, 2019*

The first set of statements the Court focuses on are Defendant's answers to Officer Gorman's questions regarding whether Defendant had "hear[d] anything or seen anything."  (Ex. 6 at 0:34-0:38.) As the evidence makes clear, Officer Gorman called out to Defendant, who immediately responded by turning and walking toward Officer Gorman, and, upon reaching Defendant, Officer Gorman asked his two preliminary questions.  (*Id.* at 0:23-0:37.)  This preliminary interaction bears the hallmarks of a "consensual encounter" during which an "officer[] may permissibly ask questions." *United States v. Peterson*, 100 F.3d 7, 10 (2d Cir. 1996) (citing *Florida v. Bostick*, 501

---

[15]       Given the Government's representation that it does not intend to admit any other statements Hester made while detained in the back of Officer Gorman's car, including those resulting from interactions with Officer Agovino and another unnamed officer, or any of Defendant's statements made at the Hospital, Defendant's motion to suppress those statements is DENIED as moot.  Defendant is granted leave to renew this motion should the Government reverse course as this case progresses to trial.

U.S. 429, 437 (1991)).  Indeed, given that Officer Gorman "was alone [at the time], did not brandish his weapon, and did not make a threatening act[] or command compliance with his [question]," a reasonable person "would have objectively believed that he was free to leave the scene" at that point. *See United States v. Ozsusamlar*, 278 F. App'x 75, 76 (2d Cir. 2008) ("Under these circumstances, where Officer Branson was alone, did not brandish his weapon, and did not make threatening acts or command compliance with his requests, we conclude a reasonable person would have objectively believed that he was free to leave the scene.").  Accordingly, to the extent Defendant is seeking to suppress these statements, his motion is DENIED.

       ii.    *Statements Related to Defendant's Gunshot Injury*

      The next statements encompassed by Defendant's suppression motion are those related to his realization that he had sustained a gunshot wound.  The record establishes that these statements were not made in response to any questions or actions by an officer.  Rather, the record indicates that several minutes of silence preceded Defendant's exclamation that he "got shot" (*See* Ex. 5 at 10:00-11:00 (time between end of Officer Agovino's interaction with Defendant and Defendant's realization that he was shot).)  After another half minute of silence, Defendant states, unprompted, "Alyah, I'm shot, I'm bleeding."  (*Id.* at 11:30-33.)  Defendant initiates an interaction with officers when he asks if they can turn on the air conditioning or open a window (*id.* at 12:16-12:34), and once they refuse, the video evidence indicates that Defendant reinitiates contact with Brown, stating "I can't read lips.  I can't read lips. My leg is bleeding. I'm bleeding."  (*Id.* at 12:45-12:52.)  Several minutes pass with Defendant commenting on his condition, and when he does finally indicate to officers that he was shot, he was the individual who initiated the interaction, presumably to flag his medical needs and obtain treatment as needed.  (*Id.* at 15:07-09.)  Each of these utterances ultimately constitute "spontaneous statements" that are not subject to *Miranda*'s protections.  *See Colon*, 835

F.2d at 30.  And, to the extent that Officer Gorman did ask questions about the injury, they were, viewed in the totality of the circumstances, necessarily a response to Defendant's medical needs, and not an attempt to extract incriminating information.  Accordingly, Defendant's motion to suppress these particular statements is DENIED.

   iii.    Statements Made on April 3, 2019

Defendant's final suppression challenge targets his statements made to Agent Dellapia and Officer McGann on April 3, 2019.  As to these statements, there is no dispute that Defendant invoked his *Miranda* rights on the evening of April 2, 2019.  There is similarly no dispute that, during the drive to the FBI office and, thereafter, the court, the officers did not re-advise defendant of his *Miranda* rights.  Finally, there is no dispute that, at this point, Defendant was in custody.  The sole question then is whether Defendant's statements were made during an interrogation.  They were not.

As represented by the Government, Defendant began the interaction with Agent Dellapia and Officer McGann by asking them where he was being taken and why he was being charged, to which the officers provided a response.  This, accordingly, is a situation where the officers merely "supplied [the defendant] the information regarding the crime" he was going to be charged with in response to his question.  *See United States v. Cota*, 953 F.2d 753, 759 (2d Cir. 1992) (concluding that statements made in the car on the way to arraignment were not a product of custodial interrogation where defendant initiated the discussion with the officer by "inquiring of him why she was being arrested").

Then, accepting the Government's seemingly uncontroverted version of events, Defendant provided his account of the April 2, 2019 incident without prompting.  There is no indication, from Defendant or the Government, that he was responding to an express question or its functional equivalent.  Thus, although Defendant may have been in custody and invoked his *Miranda* rights the day before, he appears to have made volunteered spontaneous statements that are not subject to *Miranda*'s protection.  *See United States v. Noble*, No. 07 Cr. 284(RJS), 2008 WL 1990707, at *7

(S.D.N.Y. May 7, 2008) (declining to suppress statements made while defendant was in transit to police station where "defendant started speaking, first asking repeatedly if he could have his shoes back" and then asking "can I please have my gun"); *see also Fiseku*, 2015 WL 7871038 at *15 (declining to suppress statements where defendant "volunteered that all the items found inside the car were his," even though he was in custody at the time he made his statements).

And, to the extent any follow up questions were asked, Defendant, outside of his conclusory assertion that he was questioned, offers no basis for the Court to conclude that the officers' statements were anything more than clarifying questions. *See United States v. Rommy*, 506 F.3d 108, 133 (2d Cir. 2007).[16] In short, there is no basis to suppress Defendant's statements made on April 3, 2019 under the Fifth Amendment.

To the extent Defendant basis his challenge under the Sixth Amendment, his challenge likewise fails. "The Sixth Amendment right to counsel attaches 'at the initiation of adversary judicial proceedings,' such as arraignment or filing of an indictment." *United States v. Edwards*, 342 F.3d 168, 182 (2d Cir. 2003) (quoting *United States v. Yousef*, 327 F.3d 56, 140 (2d Cir. 2003)); *see also United States v. Richardson*, 837 F. Supp. 570, 573 (S.D.N.Y. 1993) ("It is well established that the Sixth Amendment right to counsel does not attach until charges have been filed regarding the subject of interrogation."). Here, Defendant's statements were made during his transport to the

---

[16] The Second Circuit in *Rommy* acknowledged that "clarifying questions" that seek to "expand the scope" of volunteered statements may demand a more searching inquiry to determine whether the question had "moved beyond neutral clarification to interrogation." 506 F.3d at 133. That is not the case here. According to the Government, the only question Agent Dellapia asked was how Defendant could identify someone who was wearing a mask. Such a statement, in this Court's view, does not seek to "expand the scope" of Defendant's volunteered statement regarding his explanation that he "followed the girl up the stairs" and then "saw that the girl was with a 'masked guy.'" *Cf. United States v. Jacques*, 555 F. App'x 41, 45-46 (2d Cir. 2014) (concluding that law enforcement question regarding "who 'Mike' was," after defendant had mentioned the name of an individual he wanted present prior to talking, was nothing more than a question to "seek clarification of what defendant has already volunteered").

FBI office and then to court, all of which preceded any arraignment, indictment, or formal charging document.  As a result, Defendant's right to counsel had not yet attached.

In conclusion, Defendant has failed to establish that his statements to law enforcement on April 3, 2019 should be suppressed.  Defendant's motion to suppress those statements is DENIED.

### D.  Statements Made During April 4, 2019 Jail Calls

Defendant appears to seek suppression of the April 4, 2019 jail recordings on the basis that they are the "direct product of his illegal detention and arrest."  (First Mot. 23-24.)  The Court disagrees.  As an initial matter, the Court has already concluded that officers had probable cause to arrest Defendant by the time he was at the Hospital and his detention prior to that was a permissible investigatory stop.  But even if detention was impermissible, the statements made during the April 4, 2019 call between Defendant and Brown were not the fruit of an illegal seizure.

"Evidence obtained by exploitation of a primary illegality is regularly excluded under traditional taint analysis as the 'fruit of the poisonous tree.'"  *United States v. Morales*, 788 F.2d 883, 885 (2d Cir. 1986) (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)). This exclusionary rule "reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'"  *United States v. Cacace*, 796 F.3d 176, 188 (2d Cir. 2015) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).  To obtain suppression, it is not enough to establish that the evidence would not have been obtained "but for" the illegal search or seizure.  *See United States v. Nayyar*, 221 F. Supp. 3d 454, 467 (S.D.N.Y. 2016).  "Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  *Wong Sun*, 371 U.S. at 487-88 (internal quotation

and citation omitted).  In assessing whether a statement has been purged of taint, courts will consider, among other things, "whether a *Miranda* warning has been given and waiver obtained, the temporal proximity of the illegal seizure and the contested [evidence], the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct."  *United States v. Thompson*, 35 F.3d 100, 105 (2d Cir. 1994) (citing *Brown v. Illinois*, 422 U.S. 590, 603 (1975)).

Here, although Defendant contends that the jail recordings are the "direct product of his illegal detention" (First Mot. 24), he ignores the important intervening events that negate any inference that evidence was obtained by exploiting any alleged illegality.  The jail calls between Defendant and Brown took place two days after his arrest, and by that time he had been provided his *Miranda* rights, had been arraigned on a complaint, and was ordered detained by Magistrate Judge McCarthy.  *See United States v. Ripley*, No. 02 CR. 1106 RCC, 2003 WL 21982964, at *4-5 (S.D.N.Y. Aug. 20, 2003) ("The fact that Defendant appeared before a judicial officer, was advised of his *Miranda* rights on three occasions and had the opportunity to consult with and retain counsel indicate that the August 6th statements were sufficiently attenuated from any unlawful conduct."). Moreover, as the Government notes, and Defendant does not seriously dispute, the calls were made by Defendant as a matter of course by defendant's own volition and upon notice that such calls are recorded at WCF.  (Ex. 8 at 0:57-1:02; Ex. 9 at 0:54-0:58.)  Thus, any conclusion that the recordings were a fruit of an illegal seizure is plainly unwarranted.  *See Wong Sun*, 371 U.S. at 491 (concluding that an unsigned confession was not the fruit of illegal arrest where defendant "had been released on his own recognizance after a lawful arraignment" and returned to "voluntarily . . . make the statement").[17]  Defendant's motion to suppress the April 4, 2019 jail recordings is DENIED.

---

[17]   In his First Reply, Defendant alludes to impropriety in how the Government obtained the jail recordings.  (First Reply 10.)  The record is devoid of any basis to draw such an inference.  As an initial matter, "[a]lthough

**E. Defendant's Cellphone**

Defendant's final suppression challenge appears to target the Government's seizure of his cellphone.  (First Mot. 23.)  As previously noted, there was sufficient basis for Defendant's seizure and arrest, which wholly undermines the premise of Defendant's challenge.  In any event, the Government's obtaining of Defendant's cellphone was proper under the independent source doctrine. Under that doctrine, where a defendant has been illegally searched or seized, evidence subsequently obtained by a warrant will be admissible "as long as (1) information gathered from the initial illegal search [or seizure] did not influence [] 'the agents' decision to seek the warrant,' and (2) information from the initial illegal search was not 'presented to the Magistrate' such that it influenced '[the] decision to issue the warrant.'"  *United States v. Hernandez*, No. 19 CR 0097(VM), 2020 WL 3257937, at *27 (S.D.N.Y. June 16, 2020) (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)).

Here, even if the Court again assumed the arrest's illegality, both prongs of the independent source doctrine have been met.  To begin, there is no indication that the information derived from Defendant's detainment on April 2, 2019 influenced the Government's decision when it applied for the warrant.  Rather, as explained in the April 15 Affidavit, Agent Dellapia was relying, *inter alia*, on (1) witnesses who had viewed Defendant using his cellphone during the shooting incident, and (2) his experience that defendants "who unlawfully possess and transfer firearms often store records relating to their illegal activity and to persons involved with them in that activity on electronic

---

pretrial detainees may have some residual privacy interests that are protected by the Fourth Amendment, the maintenance of prison security and the preservation of institutional order and discipline are 'essential goals that may require limitation or retraction of the retained constitutional rights.'"  *United States v. Willoughby*, 860 F.2d 15, 20 (2d Cir. 1988) (internal citations omitted).  This includes "telephone interception practices" at jails such as WCF.  *Id.*  Moreover, to extent Defendant is insinuating a violation of Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 *et seq.*, the Court finds no basis to draw that conclusion.  "Where, as here, the institution has advised inmates that heir telephone conversations are subject to monitoring," the use of telephones "constitutes implied consent to the monitoring within the meaning of Title III."  *United States v. Gotti*, 42 F. Supp. 2d 252, 284 (S.D.N.Y. 1999) (quoting *Willoughby*, 860 F.2d at 20).

devices." (Ex. 11 at 12 ¶¶ 21-24.)  Again, neither basis is specifically tethered to Defendant's detainment on April 2, 2019.

Moreover, there was more than enough information derived outside of Defendant's detainment to provide an independent basis for Magistrate Judge Davison to sign the warrant. Specifically, as to probable cause regarding the alleged crime, Agent Dellapia relied on police reports of the firearm recovered on the morning of April 2, 2019, his review of surveillance footage, Defendant's criminal history, and, notably, Individual-1's account of his interaction with Defendant on April 2, 2019 (as detailed in the criminal complaint).  (*Id.* at 9-10 ¶¶ 8-11.)  And as it pertained to probable cause that the cellphone belonged to Defendant, Agent Dellapia clearly indicates that he could rely on the home screen of the phone recovered from the incident, which pictured Defendant, and his conversation with Individual-1, who separately identified the phone as belonging to Defendant.  (*Id.* at 11-12 ¶ 21.)  Those two bases for identification, taken together, independently support a finding of probable cause as to the ownership of the cellphone.

In sum, Defendant's motion to suppress his cellphone as the fruit of an illegal arrest is DENIED.

## II.    Defendant's Motion for a *Franks* Hearing

Defendant seeks a *Franks* hearing to challenge both the cellphone search warrant and the iCloud search warrant.  (First Mot. 23; Second Mot. 11.)  As to the cellphone search warrant, Defendant alleges that certain facts in, and omissions from, the April 11 Affidavit are "obviously false" and were made either "knowingly" or "with reckless disregard for the truth."  (First Mot. 23-24.)  Regarding the iCloud warrant, Defendant maintains that the Government "intentionally deceived the court through material false statements and omissions to make it appear as if there was probable cause to search for a video that did not exist, so as to go on a fishing expedition into [his]

iCloud account." (Second Mot. 13.) The Government, in response, contends that Defendant has failed to make a "substantial preliminary showing" that either the April 11 Affidavit or iCloud Affidavit deliberately or, in a reckless disregard for the truth, contained false statements or omitted material information. (First Opp. 24-26; Second Opp. 22-23.) The Court agrees that Defendant has failed to make the requisite "substantial preliminary showing" to warrant a *Franks* hearing.

In general, there is a "presumption of validity with respect to the affidavit supporting [a] search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Even so, a defendant "may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (internal citations omitted). The standard for obtaining a *Franks* hearing, however, is "a high one," *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991), and such hearings are "not freely granted." *United States v. Mandell*, 710 F. Supp. 2d 368, 372 (S.D.N.Y. 2010). A defendant must make a "'substantial preliminary showing' that [1] a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and [2] the statement was necessary to the judge's finding of probable cause." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Franks*, 438 U.S. at 155-56, 170-71). This preliminary showing requires "specific allegations accompanied by an offer of proof"; "[u]nsupported conclusory allegations of falsehood or material omission" will not suffice. *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994) (citing *Franks*, 438 U.S. at 171).

A defendant makes a substantial preliminary showing if he or she presents "credible and probative evidence" that the misstatement or omission "was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (quoting *Awadallah*, 349 F.3d at 68)). Reckless disregard for the truth may be

established by showing "that an affiant made 'statements which failed to take account of the facts as he knew them, or which he seriously doubted were true.'" *United States v. Nejad*, No. 18-cr-224 (AJN), 2020 WL 429422, at *5 (S.D.N.Y. Jan. 28, 2020) (internal citations omitted).  As it relates to omissions, while an affiant need not provide "every fact that arguably cuts against the existence of probable cause," he or she must not "omit circumstances that are critical to its evaluation." *United States v. Levin*, No. 15 Cr. 101(KBF), 2015 WL 5602876, at *3 (S.D.N.Y. Sept. 23, 2015) (internal citations and quotations omitted).  Recklessness may be inferred in such a situation, although such an inference is not automatically drawn. *Rajaratnam*, 719 F.3d at 154.

A false statement or omission is material where it is "necessary to the [issuing] judge's probable cause finding." *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005).  The "ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *Id.* at 74 (quoting *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000)).  In other words, "[i]f, after setting aside the allegedly misleading statement or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause," a *Franks* hearing is not warranted. *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998) (quoting *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987)).

### A.  Cellphone Search Warrants

The primary basis on which Defendant challenges the cellphone search warrant is that the April 11 Affidavit (1) represented that, based on Agent Dellapia's conversation with law enforcement, he learned that "Peekskill Police Arresting Officers seized the Subject Device from PHILLIP HESTER during his arrest," and (2) did not disclose that Brown had looked through Defendant's cellphone on April 2, 2019 and did not find a video.  (First Mot. 22-23.)  Defendant,

however, has fallen well short of making the "substantial showing" necessary to warrant a *Franks*
hearing.  As an initial matter, Defendant supports his motion with conclusory allegations that Agent
Dellapia's statements and omissions were "obviously false" and "clearly" done either knowingly or
with a reckless disregard for the truth and to mislead.  (*Id.*)  Defendant provides no other factual
support to even plausibly establish an inference that Agent Dellapia acted with this requisite mindset.

At any rate, Defendant's contention that Agent Dellapia acted intentionally or in reckless
disregard is belied by the fact that law enforcement declined to execute the original cellphone
warrant issued and submitted a new application for a new search warrant that relied on the updated
information instead.  (Ex. 11 at 1 ¶ 1 n.1, 12 ¶ 23.)  Notably, the new application made it a point to
flag these corrections for Magistrate Judge Davison in a prominent footnote on the first page of the
April 15 Affidavit.[18]  (*Id.* at 1 n.1.)  These corrections undercut any minimal inference of an intention
to deceive the court or a reckless disregard for the truth.

Defendant's motion for a *Franks* hearing regarding the cellphone warrant is DENIED.

**B.  iCloud Search Warrant**

Defendant offers two bases to support his request for a *Franks* hearing on the iCloud search
warrant.  *First*, Defendant contends that the iCloud Affidavit failed to disclose the April 11 Affidavit
and "intentionally omit[ted] . . . that the [Defendant's] phone was previously searched in police
presence and that [a] video does not exist."  (Second Mot. 11.)  *Second*, Defendant contends that the
warrant "substantial[ly] changed" the characterization of Brown's search of Defendant's phone.

Preliminarily, to the extent Defendant takes issue with the iCloud Affidavit not explicitly
stating that law enforcement had made an application on April 11, 2019, that assertion is essentially

---

[18]  Defendant queries that "no explanation for the material misstatements of and omissions facts" was provided
because "[e]ither Agent Dellapia or those he is relying upon are attempting to mislead the court."  (First Reply
11.)  This bare assertion does nothing to supplement Defendant's otherwise conclusory statements.

undercut by the fact that the April 15 Affidavit, which explains those corrections, was attached as Attachment D.  (Ex. 12 ¶ 13 & Attachment D ¶ 1 n.1.)  The remainder of Defendant's omission arguments fail to make a substantial showing that Officer McGann omitted any information in order to intentionally deceive the court or in a reckless disregard for the truth.  Defendant contends that "it is clear" that a "previous search with negative results is being covered up" and done so for no other reason than "to intentionally deceive."  (Second Mot. 12.)  But Defendant offers no factual basis beyond these bare assertions for the Court to draw that conclusion.

In any case, even if the iCloud Affidavit had disclosed Brown's April 4, 2019 statement that she had not found any video of the shooting on Defendant's phone—a fact about which she had already told law enforcement on April 2, 2019 and which had been detailed in the April 15 Affidavit—it would not have altered the probable cause determination.  The iCloud Affidavit details that, when Hester's Phone was searched, no data had been found on it.  (Ex. 12 ¶ 15.)  The iCloud Affidavit then explains how, on April 4, 2019, Defendant instructed Brown to "delete anything incriminating," and followed up with that request in a later phone call.  (Ex. 12 ¶¶ 17-18; *see also* Ex. 8 at 4:30-4:58; Ex. 9 at 20:09-20:14.)  Taking all this information together, then, there was an independent basis contained in the iCloud Affidavit for Magistrate Judge Davison to conclude that there was probable cause to issue a search warrant for Defendant's iCloud account.[19]

In sum, Defendant has fallen well short of making a substantial showing for a *Franks* hearing regarding the iCloud search warrant.  Defendant's motion is therefore DENIED.

## III.   Defendant's Severance Motion

Defendant seeks to sever the two counts in the Indictment, arguing that (1) he wishes to remain silent and hold the Government to their burden on the felon-in-possession charge, but (2) he

---

[19]   The Court further notes that removing details regarding the length of time Brown viewed the phone would likewise not alter this conclusion.

intends to take the stand to explain the contexts of the phone call that forms the basis of the obstruction-of-justice charge. (First Mot. 23.) The Government responds that Defendant has failed to explain his need to remain silent and, in any event, cannot show prejudice because evidence of his obstruction charge is admissible in a trial on the felon-in-possession count. (First Opp. 28.)

Under Rule 14(a) of the Federal Rules of Criminal Procedure, courts may "order separate trials of counts" in cases where "the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant or the government." To demonstrate that severance is proper, a defendant must establish substantial prejudice. *See United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991) ("The defendant must establish prejudice so great as to deny [him or her] a fair trial."). "Substantial prejudice does not simply mean a better chance of acquittal." *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir. 1984), *cert. denied*, 469 U.S. 934 (1984). Indeed, "[g]ranting separate trials under Rule 14 simply on a showing of some adverse effect, particularly solely the adverse effect of being tried for two crimes rather than one, would reject the balance struck by Rule 8(a)." *United States v. Werner*, 620 F.2d 922, 929 (2d Cir. 1980). Rather, the prejudice of a joint trial must constitute a "miscarriage of justice." *United States v. Miller*, 116 F.3d 641, 679 (2d Cir. 1997) (quoting *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993)). And "[e]ven in those rare instances where a defendant establishes a 'high' risk of prejudice, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" *United States v. Felder*, No. S2 14 Cr. 546 (CM), 2016 WL 1659145, at *4 (S.D.N.Y. Apr. 22, 2016) (quoting *Zafiro*, 506 U.S. at 539).

"Courts have recognized that '[p]rejudice may develop when an accused wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence." *United States v. Sampson*, 385 F.3d 183, 190-91 (2d Cir. 2004) (quoting *Cross v. United States*, 335 F.2d 987, 989 (D.C. Cir. 1964)). However, "a mere unexplained assertion of this sort is not

enough." *Werner*, 620 F.2d at 930.  Instead, the defendant must make "a convincing showing that he [or she] has both important testimony to give concerning one count and a strong need to refrain from testifying on the other." *Sampson*, 385 F.3d at 191 (internal citation omitted).  Such a showing requires that "the defendant present enough information—regarding the nature of the testimony he wishes to give . . . and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine." *United States v. Ezeobi*, No. 10 Cr. 669(DLC), 2011 WL 3625662, at *3 (S.D.N.Y. Aug. 17, 2011).

Notably, the fact that evidence of the crime charged in one count may be admissible in the Government's direct case in the trial of the other will typically defeat the need to sever the counts. *See United States v. Salemo*, 499 F. App'x 110, 114 (2d Cir. 2012) (citing *United States v. Halper*, 590 F.2d 422, 431 (2d Cir. 1978)); *United States v. Broccolo*, 797 F. Supp. 1185, 1192 (S.D.N.Y. 1992).  And even where prejudice is established, a court must still "weigh the considerations of 'economy and expedition in judicial administration' against the defendant's interest in having a free choice with respect to testifying." *Sampson*, 385 F.3d at 191 (quoting *Baker v. United States*, 401 F.2d 958, 977 (D.C. Cir. 1968)).

Here, Defendant asserts that he wishes to remain silent as to count one to hold the Government to its burden.  (First Mot. 23.)  He further explains that he would testify at an obstruction trial that when he instructed Brown to "delete anything incriminating," he meant for her to "destroy personally embarrassing and compromising material."  (*Id.*)  Without more, Defendant has not satisfied his burden of making a convincing showing that severance is needed.

Initially, although the Court is mindful of the importance of the constitutional right to remain silent, Defendant has not made any showing about why he would not be able to testify as to his obstruction charges in a joint trial. *See Werner*, 620 F.2d at 930 (noting that defendant had failed to

explain why he could not give testimony at a joint trial, especially where evidence of one crime would have been admissible at another); *United States v. Davis*, No. 5:09-CR-390 (NAM), 2010 WL 11507495, at *7 (N.D.N.Y. Sept. 21, 2010) (denying severance motion where defendant provided details about testimony he would provide in a severed trial but did not address why he could not provide this testimony at a joint trial).  Instead, he merely contends, without further explanation, that testimony as to count two is in direct conflict with his need to remain silent.  (First Mot. 23.)

Not only does this explanation fail to make a convincing showing of a strong need for severance, but also, as the Government observes, it fails to account for the fact that the evidence of the underlying crime would be admissible in a separate trial on the obstruction of justice charge, and vice versa.  *See United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 160 (2d Cir. 2008) (concluding that defendant's "efforts to obstruct the investigation evidence[d] a consciousness of guilt that further support[ed] the jury's verdict); *United States v. Robinson*, 635 F.2d 981, 986 (2d Cir. 1980) (concluding that evidence of obstruction of the government's investigation was admissible to show consciousness of guilt); *United States v. Ghavami*, No. 10 Cr. 1217(KMW), 2012 WL 2878126, at *16 (S.D.N.Y. July 13, 2012) (concluding that severance was not warranted because "evidence of th[e] underlying [criminal] conduct is relevant and necessary to explain the background of the [obstruction] charge," meaning that "much of the same evidence . . . would have to be introduced at a separate trial").  As such, a separate trial would not seemingly accomplish Defendant's stated goal of allowing him to remain silent as to one count while providing testimony as to the other.  In any event, even if Defendant had met his burden on showing substantial prejudice, he has failed to establish that any purported prejudice could not be cured by limiting instructions to the jury.  *Zafiro*, 506 U.S. at 540 ("[J]uries are presumed to follow their instructions.").

Defendant's motion for severance is DENIED.

40

**CONCLUSION**

For the foregoing reasons, Defendant's motions are DENIED in their entirety. The status conference in this matter remains scheduled for August 6, 2020 at 11:30 a.m., in Courtroom 218 at the Charles L. Brieant United States Courthouse, 300 Quarropas Street, White Plains, NY 10601.

The Clerk of Court is directed to terminate the motions at ECF Nos. 16 & 23.

Dated:   June 26, 2020
         White Plains, New York

SO ORDERED.

_____
NELSON S. ROMÁN
United States District Judge

41